UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| TASHA JOHNSON, | ) | Civil Action No.: 4:10-1222-JMC-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |
| ERIC HOLDER, ATTORNEY GENERAL, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.     INTRODUCTION

This action arises out of Plaintiff's employment at FCI Williamsburg.  Plaintiff alleges she was subjected a hostile work environment and sexual harassment by her supervisor from December of 2007 through September of 2008 in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq.  Presently before the Court is Defendant's Motion for Summary Judgment (Document # 44).  All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this Report and Recommendation is entered for review by the district judge.

## II.     FACTS

### A.     Conduct of Virgil Hawkins

Plaintiff first notified the agency of her complaint of sexual harassment on September 16, 2008. She admits that there was no untoward conduct after that date.  Pl. Dep. 81.  Plaintiff testified that early December 2007 was the first time Hawkins made a comment which she considered inappropriate.  Pl. Dep. 60.  In December of 2007, she went to his office to get Gatorade and during

the conversation he stated that he had been watching her since the A.R.T. [Annual Refresher Training required of all BOP employees] and made a comment regarding the jeans she was wearing. She further testified: "he was like, oh, did you give thought to what I said to you before about me liking you? And I was like there's nothing to give thought to. He said – I told him it's not going to happen because I'm married. He knows my husband works there. He said, well, we can make this happen. I'll even pay for a hotel. And I said no. I continued to get the Gatorade and then I left."[1]  Pl. Dep. 57; see also Pl. Aff., AdminRec. pp. 33-60 at 38 (attached as Ex. 5 to Def. Motion).[2]  Hawkins denies ever asking Plaintiff to have sex with him.  Hawkins Aff. p. 2.   Plaintiff did not report this event in accordance with the agency's established policy. Plaintiff did, however, tell her friend Kristy Taylor Williams, also an employee at FCI Williamsburg and a Union Steward, about this event.  Pl. Dep. 58.  From that point forward, Plaintiff decided to have Williams accompany her anytime she needed to go to Hawkins' area.  Pl. Aff., AdminRec. pp. 33-60 at 38.

Hawkins was promoted to Education Supervisor in January 2008 and became Plaintiff's first-line supervisor.  On February 1, Hawkins said to Plaintiff, "you're pretty" and stuff like that. Pl. Aff., AdminRec. pp. 33-60 at 39. Hawkins denies ever telling Plaintiff she looked nice. Hawkins Aff. p. 2.

----

[1]The record conflicts regarding the timing and the content of this conversation.  In Plaintiff's Affidavit created during the administrative investigation, Plaintiff states that in December of 2007, Hawkins stated that he wanted to sleep with her prior to becoming her supervisor.  Pl. Aff., AdminRec. pp. 33-60 at 38.  She states that the comments regarding "we can make this happen" and about a hotel room were made in a separate conversation after he became her supervisor.  Id.

[2]Many of the documents cited in this case are part of the Administrative Record created during the administrative process.  Both Defendant and Plaintiff cite to and attach portions of this Administrative Record but use different page numbers.  For ease of reference, the undersigned refers to the page numbers as set forth by Defendant.

Plaintiff attended the Annual Refresher Training required of all Bureau employees on February 25, 26, 27, and 28, 2008, which included training on what to do if you feel you have been a victim of sexual harassment : "you can respond by communicating with the harasser directly or you may report it to one of the following: Management Official (CEO or OIA), employee services, the Special Emphasis Program Manager, an EEO Counselor***, the Ombudsman, union representative." Cunningham Decl., Ex. 4.  Hawkins also received Core Skills Training which is given to all managers and includes training on sexual harassment.  Owen Aff., AdminRec. pp. 75-81 at 79 (attached as Ex. 13 to Def. Motion).

Plaintiff attested that in April 2008 she passed Hawkins in the hallway and he said, "What's up? You know you could find a way to make this happen," which she understood to mean "For me and him to have a sexual relation [sic]." Pl. Aff., AdminRec pp. 33-60 at 39. Plaintiff did not report this comment to anyone.

Plaintiff testified that on May 19, after he became supervisor, he called her into his office and asked her to turn around and reach for something by his file cabinet.  She turned around and looked and then said, "What do you want me to get?" So he said, "Just kind of like you're reaching for something. . ." Pl. Aff., AdminRec pp. 33-60 at 40.  She believed he said this "so he could look at my ass . . . my behind, excuse me." Pl. Aff., AdminRec pp. 33-60 at 40.[3]  Sometime later she told her friend Kristy Taylor Williams but did not report this incident to anyone else with the agency. Pl. Dep. 62.

_____

[3] In contrast, during Plaintiff's 2011 deposition, she testifies that Hawkins actually said that he wanted her to reach behind her "so I can look at your behind."  Pl. Dep. 61.

Plaintiff testified that on Friday, June 20, 2008, during the agency's Education Retreat, Hawkins kept looking at her and said to her in passing, "Oh – you know – you look good." Pl. Aff. p. 40. At the end of the retreat, the Education Department gathered at a local bar near Kingstree and Hawkins bought drinks for the group, including Plaintiff. Plaintiff was observed drinking the shots Hawkins provided and "did not seem to be having any issues with Hawkins." Watkins Aff. p. 2 (attached as Ex. 9 to Def. Motion). Plaintiff admitted attending this after-hours social event. She recalled that when she walked past Hawkins, he asked her why she was ignoring him. She did not answer but kept walking. Pl. Aff., AdminRec. pp. 33-60 at 40; Watkins Aff. p. 2.

Plaintiff desired to transfer to a BOP facility in New York so that she could be closer to her family. When word came out in the summer of 2008 that there would likely be a vacancy in New York City, Plaintiff was eager to apply for it. Plaintiff testified that on June 24, 2008, several weeks before the position was announced, Hawkins was with her in the hall and told her that he would help her get the job if she would sleep with him. Pl. Aff., AdminRec. pp. 33-60 at 40. She told him that she would never sleep with someone to get a position. Pl. Aff., AdminRec. pp. 33-60 at 41. Plaintiff also testified that the following conversation transpired:

> Mr. Hawkins said, "You know, they're going to call me about you and I have to make up something." I asked, "What do you mean by that?" And he was like, "Well, I might tell them that you do a good job, but we both know . . ." And then he kind of like left it open and I was like, "What do you mean? What are you talking about?" I felt that if I didn't sleep with him then it would be based on that.

Pl. Aff., AdminRec pp 33-60 at 42.[4] It is not clear from the record whether this was a separate conversation or Plaintiff's elaboration of the conversation that occurred on June 24, 2008. Plaintiff

---

[4] Handwritten corrections have been made to this statement as well as others within Plaintiff's Affidavit, but each correction is initialed "TJ."

-4-

told her friend and co-worker Kristy Taylor Williams, Pl. Aff., AdminRec pp. 33-60 at 45, but she did not report this incident to either the EEO Office or to any one else in the agency. Hawkins denies ever telling Plaintiff that he would give her a good recommendation (voucher) if she slept with him. Hawkins Aff. p. 2.

Plaintiff averred that on September 12 she was in the teacher's office in the back of the Education Department along with two other women, Kristy Taylor Williams and L. McClary. Hawkins entered the room and asked to see her credit card book. She testified that she was wearing a shirt, pants, and the "bootie blocker," a sleeveless vest similar to that worn by nurses which is worn over the shirt. Although Plaintiff does not remember exactly what she was wearing that day, she is certain that it was not low-cut and that she was definitely covered up. She testified that when he asked to see her credit card book, she stood up and handed him the book. She testified that they were standing two arms lengths away, a comfortable distance, "when he was going like this with his eyes (indicating), kind of looking down and asked me, what kind of blouse I had on or whatever." Pl. Dep. 77. Plaintiff walked away without saying anything to Hawkins. Id.

On either September 12 or September 15[5], Hawkins was filling in for AW Meeks who was out for the day. He went over to the Education Department and checked on the classrooms. He observed that Plaintiff's students were sitting on their desks talking while a National Geographic movie played. He walked into the classroom and talked briefly with the students and then went to the Office where he found Plaintiff on the phone. Ms. Taylor was also in there. He asked for Plaintiff's lesson plan and she said they were supposed to be working on their English. He asked to

---

[5]Plaintiff avers the event occurred on September 15, Pl. Aff., AdminRec. pp. 33-60 at 51, while Hawkins avers it occurred on September 12, Hawkins Aff. p. 1.

speak to her out in the hall and told her it was unacceptable to leave the inmates unattended watching a movie. Plaintiff avers he yelled at her in front of the inmates. She advised him that he had previously approved the video for the inmates, but he denied giving the approval. He told her to take the TV out of the classroom and then he went to closeout. Pl. Aff., AdminRec. pp. 33-60 at 51; Hawkins Aff. p. 1 (attached as Ex. 10 to Def. Motion).

Ms. McClary was present in the back teacher's office on September 12 and she remembers Plaintiff handing Hawkins the purchase order book; however, she saw nothing inappropriate. She does not recall him "saying her, 'what kind of shirt do you have on?' or anything to this effect." As she said, "I honestly cannot recall anything like that happening between them." McClary Aff. p. 1 (attached as Ex. 11 to Def. Motion). Additionally, Kristy Taylor Williams does not recall either of these events. Williams Aff. pp. 1-2 (attached as Ex. 11 to Def. Motion).

Plaintiff asserts that she did not previously complain about Hawkins' conduct to anyone in her chain of command because she knew Hawkins was close friends with the Regional Director, Mr. Holt. Pl. Aff., AdminRec. pp. 33-60 at 47.[6] However, after talking with other staff at FCI Williamsburg, she decided to file a complaint. Pl. Aff., AdminRec. pp. 33-60 at 48. Tequila Gordon, also a teacher at FCI-Williamsburg, avers that Hawkins told her and other females that women found him irresistible. Gordon Aff., AdminRec. pp. 104-113 at 112 (attached as Ex. 3, Part 3 to Pl. Response). Hawkins admittedly had two relationships with other women at FCI-Williamsburg, Hawkins Aff. pp. 1-2, and Kristy Williams Taylor states that Hawkins created

---

[6]In her Response, Plaintiff states that she did not complain about Hawkins' conduct to anyone in her chain of command because Hawkins was close friends with the Associate Warden. Pl. Response p. 9. However, the cite to her Affidavit that she provides in support of this statement indicates that Hawkins was close friends with the Regional Director, Holt.

division within the Education department by telling personal information about staff to other staff. Taylor Memorandum, Admin.Rec. pp. 8-9 at 8 (attached as Ex. 3, Part 2 to Pl. Response).

Plaintiff contacted the EEO office on September 16 and talked with Powell. She felt that he was responsive to her concerns. Pl. Dep. 81-82. Plaintiff admits that Hawkins did not say or do anything inappropriate after she contacted the EEO Office. Id. However, at some point after she filed the complaint, Plaintiff noticed that Hawkins checked on her in her office six or seven times in one day and she realized that he had become aware of her complaint against him. Pl. Aff. AdminRec. pp. 33-60 at 55.

### B.    Defendant's Response to Plaintiff's Report of Sexual Harassment

The EEO counselor reported the allegations to Warden John Owen on September 22, EEOC Counselor Report (attached as Ex. 1 to Def. Motion), and on that same day the Warden instructed the Special Investigative Supervisor James Patterson to conduct a preliminary investigation regarding allegations of misconduct by Hawkins. The next day Patterson obtained an affidavit from Plaintiff, the Warden issued a verbal order to Mr. Hawkins to cease and desist any sexual harassment actions or behavior toward Plaintiff, and the matter was referred to the BOP Office of Internal Affairs for investigation. Owen Aff., AdminRec. pp. 75-81 at 76.

Warden Owen ordered a threat assessment on September 24 and on the following day, September 25, Hawkins was removed from supervisory control of Education, Assignment of Duties p. 226 (attached as Ex. 12 to Def. Motion), and assigned to work in Camp building which is separate from the main institution which houses the Education Department. Hawkins' supervisory duties were assigned to Trevor Outlaw during the pendency of the investigations. Owen Aff., AdminRec. pp. 75-81 at 76. The Threat Assessment Committee found no specific evidence that Hawkins

presented a physical threat to Plaintiff but that she perceived a potential threat. Cunningham Decl. (attached as Ex. 8 to Def. Motion); Owen Aff., AdminRec. pp. 75-81 at 77; Threat Assessment Memorandum pp. 227-229 (attached as Ex. 14 to Def. Motion).

## C.    New York Position

In summer 2008, the agency issued Job Announcement Number NYM-2008-0020, for two teacher positions at MCC New York. Applicants were asked to submit their applications between July 17 and August 8. The applications were initially reviewed by the MCC New York Human Resources staff and on September 29, four applicants, including Plaintiff, were determined to be eligible. Vacancy Announcement and Request for Referral of Eligibles, Admin Rec pp. 177 - 189, 190 - 191, 192 - 193 (attached as Ex. 15 to Def. Motion). Hector Martinez, Plaintiff and Natalie Washington were deemed eligible for the position advertised at the GS-9 level and Plaintiff and Sandra John were determined to be eligible for the position advertised at the GS-11 grade level. The applicants were thereafter interviewed by Candace Johnson who recommended Martinez and John for the two positions. Candace Johnson testified that she recommended Martinez over Plaintiff because he was bi-lingual[7], C. Johnson Dep. 9 (attached as Ex. 16 to Def. Motion), and she recommended Ms. John because (1) she had a better interview, (2) she was highly recommended, and (3) she rated above average on all her skills and abilities. C. Johnson Aff., AdminRec pp. 139-151 at 146 (attached as Ex. 17 to Def. Motion).

Since the Warden at MCC-New York was the selecting official, AW Rocky Dowd of MCC-New York, contacted AW Meeks (his counterpart at Williamsburg) for a reference

---

[7]Plaintiff's job responsibilities at FCI Williamsburg included teaching English as a second language and Spanish GED. Pl. Aff., AdminRec. pp. 33-60 at 37.

(vouchering). Meeks told Dowd that Plaintiff performed at a fully satisfactory to an exceeds satisfactory level and that she was capable of performing the job she applied for. AW Meeks Aff., AdminRec pp. 82-95 at 87-88 (attached as Ex. 18 to Def. Motion). AW Dowd testified that the voucher he received from AW Meeks was in line with what he had been told by Candace Johnson, that Plaintiff "overall was an average employee. I don't believe she received any below average ratings." However, "average" is not good enough for a transfer to New York: "while average is okay, in the vouchering process we're looking for people who are consistently above average." He explained that Ms. Johns, the selected candidate, received all above average ratings. AW Dowd Aff., AdminRec pp. 131-38 at 134-36 (attached as Ex. 19 to Def. Motion).

### D.    Administrative Process

On September 16, 2008, Mrs. Johnson made an initial contact with the EEO Office at Williamsburg and complained of unwanted sexual advancement. As a remedy, she requested that she be assigned to another position, compensatory damages of $30,000 and that Mr. Hawkins (the alleged discriminating official) receive counseling. EEO Counsleor's Report, Part A, Chronology of EEO Counseling. Admin Rec at 14. The following month, on October 28, 2008, she filed a formal complaint of discrimination[8] alleging sexual harassment. As a remedy, she requested that Mr. Hawkins receive counseling, that she and her husband be moved, and that she receive $35,000 in compensatory damages. Federal Bureau of Prisons, Discrimination Complaints and Ethics. Admin Rec at pp. 1-6 (attached as Ex. 2 to Def. Motion). The agency considered her complaint and in the

---

[8]Plaintiff filed a previous Charge of Discrimination on August 28, 2008, alleging discrimination based on disability and Defendant's failure to accommodate. Report of Investigation Complaint No. 0316 (attached as Ex. 1 to Pl. Response). Plaintiff resolved the matter with the Federal Bureau of Prisons.

formal "Acceptance Letter," notified her that it had accepted the following claim for investigation:

> On September 12, 2008, you allege that you were subjected to sexual harassment when your supervisor stated he would help you get another job if you slept with him. Additionally, you allege that your supervisor made numerous comments regarding your appearance, in a sexually suggestive manner.

Acceptance Letter. Admin Rec 29 - 30 (attached as Ex. 3 to Def. Motion).

On December 22, 2008, the agency appointed Resolution Services, LLC, a private (non-government, independent) investigative firm to investigate Plaintiff's complaint. Specifically, the firm was charged with investigating the following complaint of discrimination:

> On September 12, 2008, she alleges that she was subjected to sexual harassment when her supervisor stated he would help her get another job if she slept with him. Additionally, she alleges that her supervisor made numerous comments regarding her appearance, in a sexually suggestive manner.

Appointment Letter. Admin Rec 31 - 32 (attached as Ex. 4 to De. Motion).

A few weeks later, Plaintiff, who was represented by counsel, provided a telephonic affidavit to the Resolution Services investigator. As the investigator explained to her then, the interview was limited to the issue accepted for investigation:

> [The] allegation that on September 12, 2008, you were subjected to sexual harassment when your supervisor alleged he would help you get another job if you slept with him. Additionally you allege your supervisor made numerous comments regarding your appearance in a sexually-suggestive manner.

Pl. Aff., AdminRec 33-34.

A Report of Investigation was issued on March 9, 2009. The Report lists the issue in the complaint sexual harassment and the remedies sought remain essentially unchanged:

> On September 12, 2008, Complainant alleges she was subjected to sexual harassment when her supervisor stated he would help her get another job if she slept with him. Additionally, she alleges her supervisor made numerous comments regarding her appearance in a sexually suggestive manner.

-10-

* * *

> Complainant requests the following relief: (1) Virgil Hawkins submit to training and/or counseling regarding the inappropriateness of his actions; (2) relocation of her and her husband (who is also a FCI Williamsburg employee); and (3) damages in the amount of $35,000.

Report of Investigation p. 2 (attached as Ex. 6 to Def. Motion).

As a result of receiving the Report of Investigation, Plaintiff requested a Final Agency Decision from the United States Department of Justice.  Final Agency Decision (attached as Ex. 8 to Pl. Response).  In the Final Agency Decision, the Department of Justice determined that the Bureau of Prisons was liable for the sexually hostile work environment created by Hawkins.  Id. Plaintiff filed the present action on May 13, 2010.

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial.  Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving

party.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may

not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary

judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on

must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."

Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

     To show that a genuine dispute of material fact exists, a party may not rest upon the mere

allegations or denials of his pleadings.  See Celotex, 477 U.S. at 324.  Rather, the party must present

evidence supporting his or her position by "citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions, interrogatory

answers, or other materials."  Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v.

Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir.

1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

### A.    Causes of Action Asserted by Plaintiff

     In her Complaint, Plaintiff alleges two causes of action entitled:  (1) Hostile Work

Environment and (2) Sexual Harassment.  Defendant argues that these claims should be combined

into one cause of action for a sexually hostile work environment because Plaintiff did not raise a

hostile work environment claim in her charge of discrimination with the agency that was separate

from her claim that she was subjected to a hostile work environment based upon her sex.  In her

Response, Plaintiff argues that she has properly raised two claims, a sexually hostile work

environment claim and a quid pro quo claim.

-12-

A federal employee must seek administrative review of his grievance before filing a suit for unlawful discrimination in employment. See 42 U.S.C. § 2000e-16(b) and (c); 29 C.F.R. § 1613.211 et seq.; Zografov v. V.A. Medical Center, 779 F.2d 967, 968-69 (4th Cir. 1985). During the administrative process, the agency consistently characterized Plaintiff's allegations as follows:

> you allege that you were subjected to sexual harassment when your supervisor stated he would help you get another job if you slept with him. Additionally, you allege that your supervisor made numerous comments regarding your appearance, in a sexually suggestive manner.

See Acceptance Letter, Admin Rec 29 - 30; Appointment Letter, Admin Rec 31 - 32; Pl. Aff., AdminRec. pp. 33-60 at 33-34. See also Report of Investigation p. 2. Thus, it appears the agency treated Plaintiff's complaint as raising two claims–a sexually hostile work environment claim and a quid pro quo claim.

Defendant argues that, even if Plaintiff did raise a quid pro quo claim, it was not timely because Plaintiff did not consult an EEO counselor within forty-five days of the alleged statement by Hawkins that he would help her get another job if she slept with him. The regulations regarding federal sector equal employment opportunity provide that "an aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). This time limit is not a jurisdictional bar, but rather a statute of limitations that is subject to estoppel in appropriate circumstances. Zografov, 779 F.2d at 968-69.

Plaintiff asserts that Hawkins made the comment that he would help her get a job in New York if she slept with him on June 24, 2008, and she reported the comment on September 16, 2008. Thus, more than forty-five days had passed at the time Plaintiff first made the complaint. Plaintiff

-13-

argues, however, that the forty-five day time frame begins to run not when Hawkins made the comment but when she learned that she had not received the New York position.  The regulation expressly distinguishes cases involving personnel actions from other cases involving allegations of discrimination. Jakubiak v. Perry, 101 F.3d 23, 24 (4th Cir. 1996).  The Fourth Circuit has explained that "[s]tarting the 45-day time limit from the date of the 'last discriminatory act' makes sense in cases alleging ongoing discrimination."  Id.  However, to establish quid pro quo liability, a plaintiff must prove "that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).  Employment action must result from the refusal to submit to the sexual demands.  A threat alone is insufficient to sustain a quid pro quo claim.  Therefore, the 45-day time limit began to run when Plaintiff learned she had not received the New York position.[9]  Although it is not clear in the record when Plaintiff first learned she had not received the position, Defendant admits in its Reply that  Plaintiff's complaint would have been timely if the time began to run on the date of the personnel action.

For the reasons discussed above, Plaintiff's quid pro quo and sexually hostile work environment claims are properly before this court.

**B.     Quid Pro Quo**

To establish a quid pro quo sexual harassment claim under Title VII, a plaintiff must satisfy five elements: (1) the employee belongs to a protected group; (2) the employee was subject to

---

[9]This determination of the timeliness of Plaintiff's quid pro quo claim is based solely upon Plaintiff's allegation that her refusal to agree to a sexual relationship with Hawkins lead to her denial of the positions in New York.  Whether Plaintiff has presented sufficient evidence to sustain her quid pro quo claim is discussed below.

unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment; that is, the acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment; and (5) the employer either knew or should have known of the harassment and took no effective remedial action. Okoli v. City of Baltimore, 648 F.3d 216, 222 (4th Cir.2011). Defendant argues that Plaintiff's quid pro quo claim fails because Plaintiff fails to present sufficient evidence to satisfy the fourth element.

Plaintiff testified that Hawkins told her that he would help her get the New York position she was interested in if she slept with him. Plaintiff applied for two positions in New York and failed to receive either of them. As set forth above, the record reveals that the applicants who were deemed to be qualified for the positions, including Plaintiff, were interviewed by Candace Johnson, the Supervisor of Education at the Metropolitan Correctional Center in New York (MCC-New York), who recommended Martinez and John for the two positions. Candace Johnson testified that she recommended Martinez over Plaintiff because he was bi-lingual and she recommended Ms. John because she had a better interview, she was highly recommended, and she rated above average on all her skills and abilities.

Ultimately, the Warden at MCC-New York was the selecting official, and thus, AW Rocky Dowd of MCC-New York, contacted AW Meeks (his counterpart at Williamsburg) for a reference (vouchering). Meeks told Dowd that Plaintiff performed at a fully satisfactory to an exceeds satisfactory level and that she was capable of performing the job she applied for. AW Meeks Aff., AdminRec pp. 82-95 at 87-88. AW Dowd testified that the voucher he received from AW Meeks

-15-

was in line with what he had been told by Candace Johnson, that Plaintiff "overall was an average employee. I don't believe she received any below average ratings." However, "average" is not good enough for a transfer to New York: "while average is okay, in the vouchering process we're looking for people who are consistently above average." AW Dowd Aff., AdminRec pp. 131-38 at 134-36.

Plaintiff argues that she was not an average employee, but rather, her evaluations rated her at exceeds, outstanding or fully satisfactory. She further argues that misinformation was provided to New York regarding her actual performance as well as her proficiency in Spanish. However, she fails to present evidence that Hawkins ever communicated with Candace Johnson or AW Dowd in New York or with anyone else regarding the positions in New York. In sum, although Hawkins was Plaintiff's supervisor and he told her he would help her get a position in New York if she slept with him, Hawkins held no decision-making authority with respect to the New York positions for which Plaintiff was denied and, further, there is no evidence that Hawkins had any input in the decisions not to hire Plaintiff for those positions. Accordingly, Plaintiff fails to present evidence of a tangible employment action caused by her refusal of Hawkins' sexual advances. Therefore, summary judgment is appropriate on Plaintiff's quid pro quo claim.

## C.     Sexually Hostile Work Environment

Title VII prohibits an employer from subjecting an employee to a hostile work environment because of the employee's protected class. 42 U.S.C. § 2000e–2(a) (1). To survive a motion for summary judgment on her claim of sexually hostile work environment in violation of Title VII, Plaintiff must show that there is a genuine issue of material fact as to whether the offending conduct was 1) unwelcome, 2) based upon her sex, 3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and 4) imputable to her employer.

-16-

Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir.2003). Defendant argues Plaintiff has failed to present sufficient evidence to satisfy the third element.

To show that the conduct was sufficiently severe and pervasive, Plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Actionable harassment occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 21. Title VII is not a "general civility code." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). "Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe and pervasive standard." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir.2008).

The Fourth Circuit has established a four factor approach to evaluate the totality of the circumstances in determining whether conduct is severe or pervasive: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it was physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance. Connor v. Schrader Bridgeport Int'l, Inc., 227 F.3d 179, 193 (4th Cir.2000).

Viewing the facts in the light most favorable to Plaintiff, over the course of nine months, from December of 2007, until September of 2008, Plaintiff asserts that Hawkins stated that he wanted to sleep with her prior to becoming her supervisor, told her she was pretty, commented "You know you could find a way to make this happen" and mentioned getting a hotel, looked at her

-17-

behind, stared at her and told her she looked good, told her he would help her get a job if she slept with him, and asked her what kind of shirt she had on. Plaintiff has presented evidence that Hawkins propositioned her for sex on at least two occasions, once in exchange for help obtaining another position. Thus, an issue of fact exists as to whether Hawkins' conduct was sufficiently severe and pervasive to alter the conditions of her employment and create an abusive environment. See, e.g., Baskerville v. Culligan Intern. Co., 50 F.3d 428, 430-31 (7th Cir. 1995) (internal citations omitted) ("Drawing the line is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. . . . On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers."); Beardsley v. Webb, 30 F.3d 524, 528–29 (4th Cir.1994)(finding a hostile work environment when, over six months, a supervisor massaged an employee's shoulders, stated he wanted to "make out" and "have his way" with her, falsely accused her of having an affair, and asked her about her underwear, birth control, and the bodily effects of taking maternity leave); Mandsager v. Univ. of N.C., 269 F.Supp.2d 662, 673 (M.D.N.C.2003) (finding that allegations that professor often put his arm around plaintiff, signed correspondence "Love, William," and sexually propositioned her were sufficient to show severe and pervasive harassment for purposes of a motion to dismiss).

Defendant does not challenge the other three requirements of Plaintiff's sexually hostile work environment claim. However, it does assert the Ellerth/Faragher affirmative defense to liability. Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The defense permits

an employer to avoid strict liability under Title VII for a supervisor's sexual harassment of an employee if no tangible employment action was taken against the employee.  Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 266 (4th Cir.2001).  As discussed above, Plaintiff fails to present evidence of a tangible employment action taken against Plaintiff that was caused by Hawkins.

To prevail under the defense, the employer must establish that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and ... that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 266–67 (internal quotation marks omitted).

An employer's "dissemination of an effective anti-harassment policy provides compelling proof that [it] has exercised reasonable care to prevent and correct sexual harassment." Id. at 268 (internal quotation marks omitted).  Additionally, an anti-harassment policy which includes a reasonably effectual complaint procedure is an important element of the affirmative defense. Brown v. Perry, 184 F.3d 388 (4th Cir. 1999) (quoting Faragher v. Boca Raton, 524 U.S. at 808).  However, evidence showing that the employer implemented the anti-harassment policy "in bad faith" or was "deficient in enforcing the policy will rebut this proof."  Matvia, 259 F.3d at 268.

The Bureau of Prisons had an effective anti-harassment policy in place.  In addition to written policies available on the internet and in the Human Resources Office, the agency posted the anti-sexual harassment notice in the employee break room, where it was easily viewed by all. The Bureau had mandatory annual training on preventing sexual harassment for all employees; the required record of attendance proves that both Ms. Johnson and Mr. Hawkins received this training in January 2008.  That presentation notified all employees that sexual harassment was against the law. Another slide notified the employees that, "if you feel you have been a victim of sexual

-19-

harassment, you can respond by communicating with the harasser directly or you may report it to one of the following: Management Official (CEO or OIA), employee services, the Special Emphasis Program Manager, an EEO Counselor***, the Ombudsman, union representative." The complaint procedure allowed several alternative avenues of complaint, in case the complainant wanted to by-pass the chain of command or was looking for the most sympathetic ear. Cunningham Decl. and Exs. 1-6 (attached as Ex. 8 to Def. Motion).

Furthermore, the Bureau of Prison's anti-harassment policy was enforced. Plaintiff's first step in compliance with the reporting procedures occurred on September 16 when she notified the EEO office of the alleged harassment. With her consent, the EEO Counselor notified the Warden that Plaintiff had made allegations of conduct of a sexual nature and bribery on September 23. In response, the Warden ordered a threat assessment on September 24 and made a formal referral to the BOP Office of Internal Affairs for Investigation on September 25. The Threat Assessment Committee completed its investigation on September 25, finding no specific evidence of a threat. Despite this, as a precautionary measure on September 25, Hawkins was removed from supervisory control of the Education Department and assigned to work in the separate Camp building, away from the main institution. Cunningham Decl. Plaintiff argues that the anti-harassment policy was not effective because despite his assignment to work in the separate Camp building, Hawkins came into the main institution on several occasions. However, it is undisputed that Plaintiff suffered no more harassment from Hawkins once she report his actions to the EEO office.

Defendant next argues that Plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise because she failed to report Hawkins' conduct for several months after it began. The Fourth Circuit, in Barrett v.

Applied Radiant Energy Corporation, 240 F.3d 262 (4th Cir.2001), discussed this prong of the

affirmative defense:

> "[T]he law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." An employee's subjective belief in the futility of reporting a harasser's behavior is not a reasonable basis for failing to take advantage of any preventive or corrective opportunities provided by the employer.
>
> We acknowledge that discussing such matters as sexual harassment with company managers often puts the harassed employee in an awkward and uncomfortable situation. Nevertheless, this "inevitable unpleasantness" cannot excuse an employee from taking advantage of her employer's complaint procedure. Little can be done to correct this objectionable behavior unless the victim first blows the whistle on it. "[A]n employee's subjective fears of confrontation, unpleasantness or retaliation thus do not alleviate the employee's duty under Ellerth to alert the employer to the allegedly hostile environment." Allowing subjective fears to vitiate an employee's reporting requirement would completely undermine Title VII's basic policy "of encouraging forethought by employers and saving action by objecting employees." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 764 (emphasis added).

Id. at 268–69 (some internal citations omitted).

Plaintiff asserts that she did not report the conduct to anyone in her chain of command

because she knew Hawkins was close friends with the Regional Director, Mr. Holt.  However, the

Bureau's policy provides several avenues for making a complaint, in case the complainant wanted

to by-pass the chain of command.  Plaintiff also points to the Final Agency Decision, where the

Department of Justice concluded[10] that Plaintiff seeking a position outside her institution and the fact

---

[10]This court is not bound by the determinations made by the agency where, as here, Plaintiff has filed a Complaint seeking a determination of the merits and not just to enforce the judgment of the agency.  See Boarnan v. Sullivan, 769 F.Supp. 904, 908 (D.Md. 1991) (citing Moore v. Devine, 780 F.2d 1559 (11th Cir.1986)); see also Ross v. Satellite Communications Corp., 759 F.2d 355, 363 (4th Cir. 1985), overruled on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (noting in dicta that EEOC proceedings may be relevant to a summary judgment proceeding, but "are no substitute for an independent judgment on the part of the district court").

that she was aware of Hawkins intimidation of Glenda Bowden and Tequila Gordon[11] made her delay in reporting the sexual harassment and sexually hostile work environment reasonable. Nevertheless, as set forth in Barrett, an employee's subjective fears of confrontation, unpleasantness, or retaliation do not alleviate the employee's duty under Ellerth to alert the employer to the allegedly hostile environment.

Because Defendant has shown that it exercised reasonable care to prevent and promptly correct the sexually harassing behavior, and that Plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by Defendant or to avoid harm otherwise, Defendant has established an affirmative defense to liability for Plaintiff's sexually hostile work environment claim and summary judgment is appropriate.

## V.    CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary Judgment (Document # 44) be granted and this case be dismissed.

> s/Thomas E. Rogers, III
> Thomas E. Rogers, III
> United States Magistrate Judge

January 16, 2013
Florence, South Carolina

---

[11]Although not set forth in her Response, the Final Agency Decision cites to the fact that Glenda Bowden and Tequila Gordon told her that Hawkins harassed them as well. Final Agency Decision, p. 16.